239 F.3d 211 (2nd Cir. 2001)
 UNITED STATES OF AMERICA, Plaintiff Appellee,
v.
SECRETARY OF HOUSING AND URBAN DEVELOPMENT, Third-Party Defendant
SHIRLEY C. BROWN, in her capacity as a member of the State Board of Regents; LORA BRADLEY CHODOS, in her official capacity as a member of the State Board of Regents; THOMAS FREY, in his official capacity as a member of the State Board of Regents; WILLARD A. GENRICH, In his official capacity as a member of the State Board of Regents; NORMA GLUCK; EMLYN I. GRIFFITH, in her official capacity as a member of the State Board of Regents; FLOYD S. LINTON, in his official capacity as a member of the State Board of Regents; VINCENT TESE; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SAMUEL PIERCE; SALVADORE SCLAFINI, in his official capacity as a member of the State Board of Regents; THOMAS SOBOL; MARIO CUOMO; MARTIN C. BARRELL, in his official capacity as a member of the State Board of Regents; JAMES MCCABE, SR., in his official capacity as a member of the State Board of Regents; MIMI LEVIN LIEBER, in her official capacity as a member of the State Board of Regents; YONKERS COMMUNITY DEVELOPMENT AGENCY, Defendants Appellees,
CITY OF YONKERS; Defendant Appellant Cross Appellee,
YONKERS BOARD OF EDUCATION, Defendants Appellants,
v.
YONKERS FEDERATION OF TEACHERS; Intervenor Defendant
YONKERS BRANCH NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; Intervenor Plaintiff Appellee Cross Appellant,
R. CARLOS CARBALLADA, in his official capacity as a member of the State Board of Regents; LOUISE P. MATTEONI, in his official capacity as member of the State Board of Regents; EDWARD MEYER, in his official capacity as a member of the State Board of Regents; JORGE L. BATTISTA, in his official capacity as a member of the State Board of Regents; STATE OF NEW YORK; BOARD OF REGENTS OF THE STATE OF NEW YORK; ADELAIDE L. SANFORD, in her official capacity as a member of the State Board of Regents; URBAN DEVELOPMENT CORPORATION OF THE STATE OF NEW YORK; GEORGE PATAKI, as Governor of the State of New York; RICHARD P. MILLS, as Commissioner of Education of the State of New York; H. CARL MCCALL, as Comptroller of the State of New York, Defendants Appellees.
 Docket Nos. 00-6022L & 00-6036XAP
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: Thursday, October 5, 2000
Decided: January 05, 2001
 
 Appeal from a modification of a consent decree designed to end intentional racial segregation in public and subsidized housing in the City of Yonkers. The City claims that the modification ordered by the District Court is an improper alteration of the prior decree and constitutes and unconstitutional race-conscious remedy. We AFFIRM the District Court in all particulars.
 RAYMOND P. FITZPATRICK, JR., Fitzpatrick, Cooper & Clark, Birmingham, Alabama (R. Scott Clark, on the brief), for Defendant-Appellant-Cross-Appellee City of Yonkers.
 MICHAEL H. SUSSMAN, Goshen, New York, for Intervenor-Plaintiff-Appellees- Cross-Appellants Yonkers Branch NAACP.
 LISA WILSON EDWARDS, United States Department of Justice, Civil Rights Division, Washington, D.C. for Bill Lann Lee, Acting Assistant Attorney General (David K Flynn, on the brief), for Plaintiff-Appellee United States of America.
 Before: KEARSE, CALABRESI, and SOTOMAYOR, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 I. BACKGROUND
 
 1
 In 1985, following a lengthy bench trial, the United States District Court for the Southern District of New York (Leonard B. Sand, District Judge) found that the City of Yonkers ("the City" or "Yonkers") had intentionally segregated its public housing and public schools on the basis of race by relegating virtually all of its subsidized housing to the predominantly minority-resident southwest part of the City, all in violation of the Fair Housing Act, 42 U.S.C. §3601 et seq., and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. United States v. Yonkers Bd. of Educ., 624 F. Supp. 1276, 1288-1376 (S.D.N.Y. 1985).
 
 
 2
 In the next year, on May 28, 1986, the District Court entered a Housing Remedy Order ("HRO"), which aimed to desegregate public and subsidized housing by requiring the City to develop additional such housing in overwhelmingly white East and Northwest Yonkers.[1] United States v. Yonkers Bd. of Educ., 635 F.Supp. 1577 (S.D.N.Y. 1986). The HRO required the City to build a specified number of subsidized housing units in specified areas by a specified date and also gave the plaintiffs and plaintiffs-intervenors in the case -- the United States and the National Association for the Advancement of Colored People ("the NAACP"), respectively -- the right to petition the District Court for further remedial orders in case these goals were not timely met. The City refused to comply with the HRO and appealed to this Court, which affirmed the District Court's liability and remedy rulings. United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1184, 1236 (2d Cir. 1987), cert. denied, 486 U.S. 1055 (1988). In spite of the length, care, and detail of this Court's opinion, the City resisted (and at times even stood in contempt of) the District Court's efforts to remedy the City's intentional racial discrimination.[2]
 
 
 3
 A brief history of this obstruction sets the stage for the present appeal. In January 1988, following our affirmance of the HRO, the parties negotiated a consent decree under which the City agreed to implement certain key parts of the HRO. The City, however, refused to take the actions required by the consent decree, and on June 13, 1988, the District Court entered a Long Term Plan Order ("LTPO") setting forth the specific steps the City had to take in implementing the HRO. The LTPO:
 
 
 4
 (1) required the City to ensure that a certain percentage of low income housing units were included in any new multi-family housing development;
 
 
 5
 (2) directed the City to disperse the assisted housing units in a manner that avoids the "undue concentration of both public and assisted units in any neighborhood of Yonkers;" and
 
 
 6
 (3) created a system of priorities among those eligible for assisted housing as follows:
 
 
 7
 priority 1 -- persons who had been residents of public or subsidized housing in the City of Yonkers between January 1, 1971 and the date at which assisted housing under the LTPO was made available;
 
 
 8
 priority 2 -- residents of the City of Yonkers;
 
 
 9
 priority 3 -- persons employed in the City of Yonkers.
 
 
 10
 Under the LTPO, the City earned housing credits (to be used towards achieving the goals of the HRO and Consent Decree) whenever it apportioned housing according to the priority scheme (and also when it took certain other housing actions).
 
 
 11
 Once again, the City failed to implement the terms of the remedial order, and in October 1993, the District Court entered a Supplemental Long Term Plan Order ("SLTPO") setting forth additional measures to remedy the City's ongoing housing segregation. Although this Court affirmed the SLTPO on appeal, United States v. Yonkers Bd. of Educ., 29 F.3d 40 (2d Cir. 1994) (per curiam), cert. denied, 515 U.S. 1157 (1995), and although the City's earlier open and aggressive defiance of the Court desegregation orders had subsided, the City continued to fail to provide the new subsidized housing the SLTPO contemplated.
 
 
 12
 Accordingly, on November 6, 1996, the District Court entered a Second Supplemental Long Term Plan Order ("SSLTPO") to promote further the implementation of the HRO. Among other things, the SSLTPO required the City to provide at least 100 additional units of affordable housing per year to LPTO qualified individuals in each of the next 6 years. The District Court also reserved the right to modify the SSLTPO on request from any party, or even sua sponte, if it determined that "the goals set forth [in the SSLTPO] are not likely to be realized in the foreseeable future, absent such modification."
 
 
 13
 In each of the first two years of the SSLTPO (1997 & 1998) the parties disputed the number of credits towards the goal of 100 units per year to which the City was entitled. In adjudicating these disputes, the District Court recognized, and shared, the plaintiffs' concern that the City's remedial measures were not adequately benefitting priority one households. At a hearing held in February 1999, the Court requested that the parties submit "a proposed revision of the remedy order designed to increase the ability of priority 1 class members to have greater housing opportunity," and also "more carefully [to] define what is meant by furthering the integrative purposes of the order."
 
 
 14
 The District Court held another hearing in September 1999, in which it heard arguments relating to the participation of priority one households during the first 2 ½ years of the SSLTPO and also on the SSLTPO's effect on furthering integration in the City's housing. The Court determined that the housing program's "accomplishments to date fall far short of what one hoped for," and it ordered the parties to confer and to prepare a new remedial order. On December 29, 1999, the District Court granted the City nearly all the housing credits it had requested for its activities in 1998 (as it had earlier done with respect to the City's 1997 requests). At the same time, the Court granted these credits only "on the condition and understanding that no future credits will be granted unless" the City creates housing opportunities that "further the racially integrative goals which are the essence of all the Court's prior housing remedy orders intended to counter the effects of prior racial discrimination in housing in Yonkers."
 
 
 15
 To this end, the District Court entered the Third Supplemental Long Term Plan Order ("TSLTPO"). The TSLTPO specified that, with exceptions that are not relevant here, future housing credits would be awarded to the City only:
 
 
 16
 (a) for priority one households that move to census blocks in East and Northwest Yonkers that, as of 1990, had a minority (black and Hispanic) population of below 45%;
 
 
 17
 (b) for minority priority two & three households that move to census blocks in East and Northwest Yonkers that, as of 1990, had a minority population of below 45%; and,
 
 
 18
 (c) for non-minority priority two and three households that move to census blocks in East and Northwest Yonkers that, as of 1990, had a white population of below 45%.
 
 
 19
 In addition, as a carrot to accompany this stick, the District Court instituted a complicated bonus system under which the City would, if it reached certain targets for the placement of priority one households, receive more than one unit of housing credit for each household placed.[3]
 
 
 20
 With minor revisions that are not relevant here, this is the order the City of Yonkers now appeals. Specifically, the City contends (1) that the District Court's newest remedial order represents an improper modification of the consent decree that had previously been in place and (2) that the new order employs race-conscious remedial devices in an unconstitutional manner. At the same time, the NAACP cross-appeals the bonus-credit element of the TSLTPO, arguing that this modification improperly weakens the remedial character of the order and improperly rewards the City for its dilatory tactics. Because we find that the TSLTPO satisfies the standards for modifying a consent decree set out in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383-85 (1992), and because we find that the TSLTPO's use of race satisfies even the strict scrutiny to which legislative race-conscious remedies must be subjected, see Adarand Constrs., Inc. v. Pena, 515 U.S. 200, 227 (1995), we reject the City's challenge. Furthermore, although we might not have adopted the bonus-credit element of the TSLTPO ourselves, we defer to the District Court's more intimate knowledge of the case and on that basis reject the NAACP's cross appeal. We accordingly affirm the District Court's remedial order in its entirety.
 
 II. DISCUSSION
 A. The City's Appeal
 1. The Modification
 
 21
 The City's first contention on appeal is that the TSLTPO represents an improper, and hence impermissible, modification of the consent decree that preceded it, namely the SSLTPO.[4]
 
 
 22
 Fed. R. Civ. P. 60(b) clearly contemplates that remedial orders may be modified, providing that:
 
 
 23
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.
 
 
 24
 Furthermore, because consent decrees are injunctions, their modifications are reviewed for abuse of discretion only. Juan F. v. Weicker, 37 F.3d 874, 878 (2d Cir. 1994), cert. denied, 515 U.S. 1142 (1995). Consent decrees are, however, also contracts between the parties. Id. This fact, combined with the concern that allowing consent decrees to be too easily modified would discourage parties from accepting compromise settlements, has led to a significant cabining of District Courts' discretion to modify consent decrees. "Modification is a remedy not to be lightly awarded, 'especially where the design is not to relieve a party of obligations but to impose new responsibilities.'" Id. (quoting Walker v. HUD, 912 F.2d 819, 826 (5th Cir. 1990)).[5]
 
 
 25
 At the same time, however, the past decade has seen a significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees. At least in the context of institutional reform litigation, the Supreme Court has softened the traditional rule that "[n]othing less than a clear showing of grievous wrong evoked by new and unforseen conditions" could justify modifying a consent decree. United States v. Swift & Co., 286 U.S. 106, 119 (1932). In reconsidering this rule, the Supreme Court has reasoned that "[t]he experience of the District Courts and Courts of Appeals in implementing and modifying [consent] decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation," Rufo, 502 U.S. at 381, and that this flexible approach is especially important because consent decrees in this context "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." Id. (internal quotation marks omitted).
 
 
 26
 Changes in consent decrees are not trivial matters even under the new standard. The Supreme Court has made clear that "it does not follow that a modification will be warranted in all circumstances," and that a party seeking an alteration bears the initial burden of establishing that a significant change in circumstances warrants the modification. Id. at 383. But instead of facing Swift's requirement of making "a clear showing of grievous wrong evoked by new and unforeseen conditions," Swift, 286 U.S. at 119, a party seeking a modification may now meet its burden simply by showing that there has been "a significant change either in factual conditions or in law." Rufo, 502 U.S. at 384.[6] And under Rufo, a modification due to changed factual conditions -- the circumstance relevant to the case before us -- is "appropriate when a decree proves to be unworkable because of unforseen obstacles,"[7] or when "enforcement of the decree without modification would be detrimental to the public interest." Id.
 
 
 27
 The City, which recognizes these developments in the law, contends that the modification at issue in the present appeal does not pass even the more flexible Rufo test. That contention, however, may be straightforwardly rejected. The SSLTPO was adopted to promote the implementation of the HRO and thereby to further the ultimate goal of remedying the City's past intentional racial discrimination in its public and subsidized housing. And by the time of the modification before us (i.e., the adoption of the TSLTPO), it had become manifest that neither the intermediate nor the ultimate goal of the SSLTPO was being achieved.
 
 
 28
 To begin with, the City's actions under the SSLTPO were clearly failing to reflect the priority scheme that had been established under the HRO. In 1997, only 29% of the SSLTPO's beneficiaries were priority one households, 68% were priority two, and 3% were priority three; and in 1998, only 7.9% were priority one, 85.4% were priority two, and 6.7 % were priority three. Furthermore, the City's actions under the SSLTPO were similarly inadequate in achieving the "integrative goals which underlie the entire remedy order."[8] Thus, the District Court found that during 1998 (the second year of the SSLTPO), 31 out of the 73, or 45.5% of, public housing moves completed under the SSLTPO were non-integrative (that is, they involved moves by whites into census blocks that were less than 45% minority or by minorities into census blocks that were more than 45% minority).[9] And, the Court also concluded that in the first eight months of 1999 (the third year of the SSLTPO, and the period leading up to the modification at issue and the adoption of the TSLTPO), 13 out of the 26, or 50% of, public housing moves under the SSLTPO were non-integrative.[10] These data reveal that more than two years after its adoption, roughly half of those housing allocations made under the SSLTPO whose effects on the racial segregation of Yonkers public housing are known remain non-integrative.[11]
 
 
 29
 In light of these facts, we conclude, with the District Court, that the SSLPTO "prove[d] to be unworkable because of unforseen obstacles" -- specifically the continued failure of the City to serve priority one households and to promote integrative housing moves -- and that continued "enforcement of the [SSLTPO] without modification would be detrimental to the public interest" -- the achievement of the goals of serving priority one households and desegregating Yonkers public housing. Rufo, 502 U.S. at 384. Accordingly, we hold that the modification of the SSLTPO embodied in the TSLTPO was well within the discretion of the District Court, and we reject this element of the City's appeal.
 
 The Race-Conscious Remedy
 
 30
 The City's second contention on appeal is that the TSLTPO -- by conditioning the City's receipt of credits for housing priority two and three families on the race of the families and on the racial makeup of the neighborhoods in which they are housed -- employs a race-conscious remedy in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Such a race-conscious remedy, the City contends, cannot survive the strict scrutiny to which such remedies must be subjected under Adarand Constrs., Inc. v. Pena, 515 U.S. 200, 227 (1995); see also Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273-74 (1986) (plurality opinion of Justice Powell).
 
 
 31
 In this respect we first note that, although the language adopted by Adarand, that "all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny," Adarand, 515 U.S. at 227, is unquestionably broad, both Adarand and Wygant involved race-based remedies adopted by governmental agencies other than courts. In Adarand, they were imposed by the United States Congress (at 15 U.S.C. §644(g)(1)), see Adarand, 515 U.S. at 206; in Wygant, by a local school board, see Wygant, 476 U.S. at 269-70. And it may be, as Justice Stevens argued in casting the fifth vote to affirm a court-ordered race-based remedy integrating the Alabama State police, that strict scrutiny does not apply to race-based remedies ordered by "a district judge who has found that the governmental unit before him is guilty of racially discriminatory conduct that violates the Constitution." United States v. Paradise, 480 U.S. 149, 193-94 (1987) (Stevens, J., concurring); see also Crumpton v. Bridgeport Educ. Ass'n, 993 F.2d 1023, 1030-31 (2d Cir. 1993) (suggesting that a district court's race-based remedy may not be subject to strict scrutiny where it follows an express finding that a government agency employed practices that contributed to racial segregation).
 
 
 32
 We need not, however, reach this question in order to decide the case before us. As the plurality opinion in Paradise points out, a race-conscious remedy that can survive even strict scrutiny may be affirmed regardless of whether strict scrutiny or only a lesser standard of review applies. Paradise, 480 U.S. at 166-67. And the remedy embodied in the TSLTPO clearly survives even strict scrutiny.
 
 
 33
 To pass strict scrutiny, a race-conscious remedy must be narrowly tailored to further a compelling government interest.[12] Adarand, 515 U.S. at 227. In the case before us, there is no doubt that the second element of this requirement is met. The district court expressly found that the City has engaged in intentional racial discrimination in its subsidized housing program, United States v. Yonkers Bd. of Educ., 624 F.Supp. at 1288-1376, and "[t]he Government unquestionably has a compelling interest in remedying past and present discrimination by a state actor." Paradise, 480 U.S. at 167. Accordingly, the parties' arguments on appeal have quite properly focused on the first element of the strict scrutiny requirement, namely the question whether the district court's race-conscious remedy is narrowly tailored to further this unquestionably compelling interest.
 
 
 34
 To determine whether a race-conscious remedy is narrowly tailored to the ends it serves we must consider (1) the necessity for relief and the efficacy of alternative remedies, (2) the flexibility and duration of the relief, (3) the relationship of the numerical goals of the relief to the relevant labor market (or to its analog in a case involving something other than employment discrimination), and (4) the impact of the relief on the rights of third parties. Paradise, 480 U.S. at 171. The TSLTPO comfortably passes all four elements of this test.
 
 
 35
 First, the necessity of relief in the case at bar is patent. As we have said in an earlier opinion in this case, "'the choice of remedies to redress racial discrimination is a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court' . . . . The district court, which has 'first-hand experience with the parties and is best qualified to deal with the flinty, intractable realities of day-to-day implementation of constitutional commands,' must be given a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation . . . ." United States v. Yonkers Bd. of Educ., 837 F.2d at 1236 (quoting Paradise, 480 U.S. at 184 (other internal quotation marks omitted)). Furthermore, even if a race-conscious judicial remedial order were permissible only where no less restrict alternative is available, that standard is met in the case before us. In spite of fifteen years of remedial efforts encompassing four race-neutral remedial regimes (the HRO simpliciter, and the HRO combined with the LTPO, the SLTPO, and the SSLTPO), and at least partly because of the active and passive resistance to integration displayed by the City (and documented in both this and in our earlier opinions), Yonkers public housing remains substantially segregated even today. Roughly half of the housing moves under the most recent race-neutral remedy were non-integrative, see supra, at 217-18. And, at the September 9, 1999 hearing that led to the adoption of the TSLTPO, the District Court, expressly responding to the City's contention that a race-based remedy would fail strict scrutiny, concluded that "the experience [of race-neutral remedies] has not been satisfactory." We agree, and hold that the first of the Paradise factors is satisfied in this case.
 
 
 36
 Second, the TSLTPO is both "flexible" and "ephemeral." Paradise, 480 U.S. at 177-78. The TSLTPO contemplates that the District Court will adjust the terms of the Order as needed (for example, the circumstances in which the bonuses and penalties that the Order mandates will apply). And, as its focus on determining the grant of credits towards the goals set forth in the SSLTPO reveals, the TSLTPO will remain in force only until the discrete goals of the SSLTPO and of the earlier remedial Orders in this case have been met. Accordingly, we conclude that the second Paradise factor is satisfied.
 
 
 37
 Third, the numerical goals and conditions for awarding housing credits adopted by the TSLTPO are not disproportionate to the racial mix of Yonkers residents or the size of the Yonkers housing market. The TSLTPO retains the reasonably-paced (100 credits per year) integrative program adopted by the SSLTPO. Moreover, we "should not second-guess the [District Court's] carefully considered choice of the figure[s] necessary to achieve its many purposes, especially when [those] figure[s] [are] hedged about with specific qualifying measures designed to prevent any unfair impact that might arise from rigid application." Paradise, 480 U.S. at 182. The third Paradise factor is, therefore, satisfied.
 
 
 38
 And fourth, the TSLTPO does not unduly burden the rights of third parties. The City's claim that the TSLTPO "effectively constitute[s] an outright ban on a non-minority family's opportunity to access affordable housing in Yonkers," is meritless. The TSLTPO places no limits on the number of white families that may move into subsidized housing in greater than 45% minority neighborhoods or on the number of credits the City may receive for such moves. The TSLTPO also credits the City for providing housing opportunities in areas that are not predominantly minority to any priority one household, including white priority one households. Furthermore, insofar as the TSLTPO effectuated any reduction in the public housing available to white residents of Yonkers (a consequence we do not in any event foresee), it would do so only by reducing the number of new white applicants who would receive housing and not by expelling any white families from housing they already inhabit. And as the Supreme Court has observed in the context of access to employment, Wygant, 476 U.S. at 282-83, and to places at university, id., at 283 n. 11, the denial of a new application is much less burdensome than the loss of an existing good. We readily find that the fourth Paradise factor is also satisfied.
 
 
 39
 Finally, we must, in deciding whether the TSLTPO was narrowly tailored, "acknowledge the respect owed a district judge's judgment that specified relief is essential to cure a violation of the Fourteenth Amendment." Paradise, 480 U.S. at 183. The District Court has first-hand experience of the long and often difficult effort that remedying the City's intentional racial discrimination entails, in other words, of the "realities of day-to-day implementation of . . . constitutional commands." Swann v. Charlotte-Meklenburg Bd. of Educ., 402 U.S. 1, 6 (1971). After having carefully and patiently attempted to achieve this end by race-neutral means, after having expressly determined that such means were not succeeding, and after hearing from both sides to the dispute, the District Court adopted a race-conscious remedy that is both temperate and responsible. We therefore hold that the TSLTPO is narrowly tailored to the compelling state interest of remedying the City's past intentional racial discrimination, and we reject the City's constitutional challenge to the order.
 
 3. The NAACP's Cross-Appeal
 
 40
 In addition to granting the City housing credits only for integrative moves, the TSLTPO gives the City bonus credits (more than one credit per move) if it achieves certain targets for the placement of priority one households and imposes certain penalties (grants less than one credit per move) if the City fails to achieve these targets. The NAACP cross appeals the bonus-credit element of this regime, arguing that it improperly rewards the City for its earlier obstructionist and delaying tactics. Cf. Reed v. Rhodes, 179 F.3d 453, 478 (6th Cir. 1999) (Cole, J., dissenting).
 
 
 41
 We are skeptical of giving the City credit where no credit is due and understand the NAACP's frustration with this element of the TSLTPO. At the same time, we review District Court modifications of consent decrees for abuse of discretion only, Juan F., 37 F.3d at 878, and we do not believe that the District Court went beyond its discretion in modifying the SSLTPO in this way. Judge Sand has presided over this difficult and exhausting case with estimable patience and skill, and we will not second-guess his informed balancing of incentives in an attempt to craft a remedial plan that will be effective in the face of opposition. In short, we do not wish to have what may or may not be the best become the enemy of what is clearly the good. Furthermore, the penalty imposed in the same breath as the bonus demonstrates that the District Court was well aware of the plaintiffs' concerns that it was rewarding the City for delay and that it sought to present the City with even-handed rather than overly generous incentives. Accordingly, we reject the NAACP's cross appeal.
 
 III. CONCLUSION
 
 42
 For all the foregoing reasons, we AFFIRM the District Court's entry of the TSLTPO in its entirety.
 
 
 
 Notes:
 
 
 [1]
 On May 13, 1986, the District Court entered a separate order in the school segregation portion of the case, see United States v. Yonkers Bd. of Educ., 635 F. Supp. 1538 (S.D.N.Y. 1986), which spawned a separate history of litigation that is not directly relevant to the present appeal.
 
 
 [2]
 On August 2, 1988, the District Court found both the City and several individual City Council-members in civil contempt of its earlier remedial orders. This Court subsequently affirmed the contempt sanctions, although it limited the fines levied against the City, which had previously been doubling on each consecutive day of non-compliance, to $ 1 million per day. United States v. City of Yonkers, 856 F.2d 444, 460 (2d Cir. 1988). The Supreme Court subsequently reversed the contempt sanction as applied to the individual council members. Spallone v. United States, 493 U.S. 265, 280 (1990).
 
 
 [3]
 It is worth noting that there is a stick built into even the carrot: if the City falls short of these goals, it receives less than one unit of credit for each priority one family placed.
 
 
 [4]
 We reject the NAACP's contention that the terms of the TSLTPO do not modify those of the SSLTPO.
 
 
 [5]
 Although the text of Fed. R. Civ. P. 60(b) focuses on modifications that relieve a party from the operation of a consent decree, the above quotation clearly demonstrates that modifications, such as the one in the TSLTPO, that increase the obligations imposed by a consent decree are also permissible. See also United States v. Western Elec. Co., 46 F.3d 1198, 1202 (D.C. Cir. 1995) (noting that "[a]t the request of the party who sought the equitable relief, a court may tighten the decree in order to accomplish its intended result").
 
 
 [6]
 In articulating this standard, Rufo in effect adopted the rule this Court had articulated earlier in New York State Assoc. for Retarded Children v. Carey Inc., 706 F. 2d 956, 969-71 (2d Cir. 1983), cert. denied, 464 U.S. 915 (1983).
 
 
 [7]
 Furthermore, Rufo notes that "unforseen" does not in this context mean "unforseen and unforeseeable" and that "[l]itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree." Id. at 385.
 
 
 [8]
 The City's response -- that 70% of the beneficiaries under the SSLTPO were minority families -- cannot answer this charge. Achieving the remedy's integrative goals depends not simply on providing subsidized housing to minority families but rather on locating minority housing outside of predominantly minority neighborhoods or locating white housing outside of predominantly white neighborhoods.
 
 
 [9]
 Our own inspection of Gov't Exhibit I generates slightly different figures, namely that 29 out of 63, or 46% of, moves were non-integrative. Furthermore, the government brief reports still other numbers, specifically that 33 of 58, or 59.6% of, moves were by minority households into "predominantly minority communities" or by white households into "predominantly white communities." The pages of the appendix the government cites in support of its contention allude to the question but contain no precise claim.
 
 
 [10]
 Our own inspection of Gov't Exhibit J once again suggests slightly different numbers, specifically that, 14 out of 26, or 53.8% of, moves were non-integrative, and the government brief reports that 16 of 26, or 61.5% of, moves were by minority households into or "adjacent" to "predominantly minority communities" or by white households into "predominantly white communities." And again, the pages of the appendix the government cites in support of its contention allude to the question but contain no precise claim. The NAACP has asserted that 13 of these 26 moves were non-integrative.
 
 
 [11]
 The data needed for determining the integrative effect of the City's housing program during the first year of the SSLTPO are not available.
 
 
 [12]
 A district court's determination that a race-conscious remedy is narrowly tailored to advance a compelling government interest involves an application of law to facts, which we review de novo. See Engineering Contractors Ass'n. v. Metropolitan Dade County, 122 F.3d 895, 905 (11th Cir. 1997), cert. denied, 523 U.S. 1004 (1998).