310 F.3d 43
 PATROLMEN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, Incorporated for itself and on behalf of its members, Gary Johnson, Police Officer, Missie Lewis-Manning, Police Officer, Robert Drayton, Police Officer, Marva Gardner, Police Officer, Demetria Singleton, Police Officer, Margo McKenzie, Police Officer, Robert Winslow, Police Officer, Kenneth Zepherin, Police Officer, Oscar Espinal, Police Officer, Dave Guevera, Police Officer, Peggy Alves, Police Officer, Robin Irvin, Police Officer, Silas Plunkett, Police Officer, Ronny Forbes, Police Officer, Alton Walker, Police Officer, Barry Hinds, Police Officer, Tselanee Kitching, Police Officer, Laverne Stuger, Police Officer, Michael Butler, Police Officer, Carole P. Sievwright, Police Officer, Inger Barron, Police Officer, Ronald S. Archer, Police Officer, Plaintiffs-Appellees,
Sergeant's Benevolent Association of the City of New York, Incorporated for itself and on behalf of its members, Philip Tai and John S. Robertson, Consolidated-Plaintiffs-Appellees,
v.
THE CITY OF NEW YORK, Rudolph Giuliani, as Mayor of the City of New York and Individually, Howard Safir, as Police Commissioner of the Police Department of the City of New York and Individually, Patrick Brennan, New York City Deputy Police Chief Officially and Individually, Cornelius J. Dever, Deputy Police Chief, Officially and Individually and Michael A. Markman, Chief, Officially and Individually, Defendants-Appellants.
 No. 00-9538.
 United States Court of Appeals, Second Circuit.
 Argued January 30, 2002.
 Decided: October 17, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Julien L. Kalkstein (Michael D. Hess, Larry A. Sonnenshein on the brief), Corporation Counsel of the City of New York, New York, NY, for Appellants.
 Linda M. Cronin (Eric S. Crusius, Rocco G. Avallone, on the brief), Cronin & Byczek, LLP, Lake Success, NY, for Appellees Patrolmen's Benevolent Association.
 Peter J. Blessinger (Norman A. Olch, on the brief), Cerrone & Geoghan, New York, NY, for Appellees Tai and Robertson.
 Before: LEVAL and CALABRESI, Circuit Judges, and STEIN, District Judge.[1]
 STEIN, District Judge.
 Defendants appeal from a judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge) upon a jury verdict in favor of plaintiffs. Appellants are the City of New York, former New York City Mayor Rudolph Giuliani, former Police Commissioner Howard Safir, and certain other police officials (collectively, "the City"). Appellees are the Patrolmen's Benevolent Association of the City of New York, on behalf of 22 individual police officers, and the Sergeant's Benevolent Association of the City of New York, on behalf of two police sergeants. Plaintiffs, all of whom are black or black-Hispanic, sued the City for transferring them into New York City's 70th Precinct on the basis of their race in the wake of the beating and torture of Abner Louima, a black man, by police officers in the 70th Precinct in August 1997. They asserted violations of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. At the conclusion of a three-week trial, the jury returned a verdict in favor of the City with respect to all but one of the plaintiffs on the employment discrimination claims, but found in favor of all plaintiffs on the equal protection claim, and awarded $50,000 damages to each plaintiff. After the district court denied the City's motion for judgment as a matter of law or, in the alternative, a new trial, the City filed this appeal.
 The City asserts the following grounds for appeal: 1) plaintiff Oscar Espinal (the only plaintiff to prevail on the Title VII employment discrimination claim) failed to establish that he suffered an adverse employment action when he was transferred to the 70th precinct; 2) the City demonstrated that the race-based transfers, as a matter of law, were narrowly tailored to meet the compelling state interest of effective law enforcement and therefore did not violate the equal protection clause; 3) the jury charge on the "narrowly tailored" prong of the strict scrutiny test was erroneous; 4) the trial judge improperly "coerced" the jury to award damages to each plaintiff by issuing supplemental instructions on damages; 5) the jury charge on damages was erroneous; and 6) the damages awarded were excessive. We affirm the judgment of the district court.
 I. BACKGROUND
 The following facts are taken from the district court's opinion denying summary judgment, Patrolmen's Benevolent Ass'n of New York, Inc. v. City of New York, 74 F.Supp.2d 321, 325-26 (S.D.N.Y.1999), and the trial record. On August 9, 1997, Haitian immigrant Abner Louima was beaten and ignobly tortured by police officers in the 70th Precinct station house in Brooklyn, New York. Louima was black and the officers who assaulted him were white. Two days after the assault, leaders of the New York City Police Department ("NYPD") and the City — including Commissioner Safir and Mayor Giuliani — met with 40 to 50 leaders of the community surrounding the 70th Precinct, including Councilwoman Una Clarke, to discuss an appropriate response to the incident. Following that meeting, Commissioner Safir decided to assign additional black police officers to the 70th Precinct.
 News reports of the Louima incident began to appear on August 12. The first of several public demonstrations in response to those reports of the assault was held at the 70th Precinct the next day. Police and city officials grew concerned that the protests might become violent. On August 14, Commissioner Safir and Mayor Giuliani announced that the commanding officer and executive officer of the 70th Precinct, as well as ten police officers assigned to that precinct, were being immediately reassigned.
 A few days later, the new commanding and executive officers assumed control of the precinct, and new officers replaced those who had been removed. The commanding and executive officers were Hispanic and white, respectively, and the majority of the incoming officers were black or Hispanic. (A. 459-60, 1333.)[2] The following week, the NYPD transferred an additional 26 black and black-Hispanic police officers into the precinct. (A. 1334-35.) The City does not dispute that race was the basis for the transfers. On August 29, some 6000 demonstrators marched from Grand Army Plaza in Brooklyn to City Hall in Manhattan in protest over the Louima assault. Following the rally, approximately 100 individuals were arrested for impeding traffic on the Brooklyn Bridge. (A. 1270.) Demonstrations continued outside the 70th Precinct for the next several days.
 The Patrolmen's Benevolent Association, representing 22 of the transferred officers — who identify themselves variously as African-American, Black-Hispanic, Jamaican, West Indian, Trinidadian or Guyanese — filed this action in the U.S. District Court for the Southern District of New York in October 1997, alleging violations of Title VII, 42 U.S.C. §§ 2000(e) et seq., N.Y. Executive Law § 296, and the officers' constitutional rights pursuant to 42 U.S.C. §§ 1981, 1983 and 1985. The Sergeant's Benevolent Association, representing two transferred police sergeants, subsequently filed a complaint asserting essentially the same claims and the actions were subsequently consolidated. On cross-motions for summary judgment, the district court 1) declined to grant summary judgment dismissing the Title VII claim on the grounds that disputed issues of fact existed with respect to whether plaintiffs had suffered an adverse employment action and 2) held that the City's need for effective law enforcement could be a compelling state interest justifying a race-based measure if the City could prove at trial that such an interest existed and that the transfers were narrowly tailored to advance that interest. See Patrolmen's Benevolent Ass'n, 74 F.Supp.2d at 339.
 A jury trial was held from May 25 to June 15, 2000. More than 40 witnesses testified at the trial, including all of the plaintiffs, other NYPD officers and officials, Commissioner Safir, two expert witnesses, and Councilwoman Clarke.
 At the trial, defendants contended that the transfers, admittedly race-based, were necessary to prevent a delicate situation from getting out of control. Commissioner Safir stated that there was a "great potential for violence" in the 70th Precinct following the Louima incident and "we needed to act quickly and as quickly as possible to put people in the community who would have a stake in the community." (A. 468.) Safir testified that at the meeting held at police headquarters several days after the incident that was referred to above, "one of the themes that continually came out... was the theme that they needed more African-American officers ... and that if we wanted better police community relations then we needed to assign more African-American police officers to their community." (A. 475.)
 Councilwoman Clarke testified that at the same meeting she told Safir "unless you do something quickly we in the community may not be able to control the rage of the community." (A. 820.) Clarke did not specifically request a transfer of black officers into the precinct, although she did call for the removal from the precinct of any officer who may have known about the incident. (A. 821.) She testified that other community members "may have" requested more black officers in the community. Defendants' expert Hubert Williams, former Director of the Newark, New Jersey Police Department, testified that he believed the race-based transfers were "a very important step in defusing the volatility that existed in the community." (A. 991.) In Williams' view, there was a danger of civil disturbance in the 70th Precinct after the Louima incident and the transfer of black officers into the precinct helped to defuse tensions. He believed that the volatile situation after the incident called for swift action, and Safir was correct in responding to Clarke's "indirect" request for more black officers. (A. 1015.)
 In response, plaintiffs presented evidence that the community surrounding the 70th Precinct, while outraged, was peaceful following the Louima incident. Detective Yvan Pierrelouis, Caribbean liaison for the NYPD, testified that he canvassed the community following the incident and found no evidence of rioting, looting, or property damage. (A. 276.) Police Officer Corlis Smith, an officer in the Community Affairs Division assigned to monitor the community in the days after the incident, testified that she witnessed no community unrest. (A. 257-260.)
 The plaintiffs' testimony indicated that, far from being welcomed by black residents of the 70th Precinct, the transferred officers endured frequent insults and epithets from community members angry about the Louima assault. (See, e.g., A. 384.) Several plaintiffs also testified to tensions with the other officers in the precinct, who viewed the new officers with suspicion, believing they were part of an NYPD internal affairs investigation into the 70th Precinct. (See, e.g., A. 237.) Plaintiffs' expert Dr. Stephen Leinin, a sociologist and former New York City police officer, testified that black officers were not necessarily better at policing black communities than white officers, and that cultural similarities — such as language skills — were more important than race. (A. 844.) He also suggested other ways the City could have responded to the crisis, such as providing incentives for officers to transfer voluntarily into the district, and reaching out to Haitian-American officers and officers of different ethnic groups with training in police-community relations. (A. 847.)
 At the close of evidence, defendants moved for a directed verdict on the employment discrimination claims on the grounds that no plaintiff had suffered an adverse employment action, and on the equal protection claim on the grounds that no reasonable juror could find that there was not a crisis that justified Commissioner Safir's decision to transfer minority officers into the 70th Precinct. The court denied the motions. (A. 1094-95.)
 The trial judge then charged the jury. On the City's defense to the equal protection claim, she instructed the jury that it first had to determine whether the City had proved that "community hostility towards the New York City Police Department following the Louima incident created a crisis which compromised the goals of effective law enforcement and public safety; and that race-based transfers would restore those goals." The City did not object to that instruction. (A. 1132.)[3] If the jury found that such a compelling state interest existed, it was charged to consider, next, whether the transfers were "narrowly tailored" to satisfy that interest; in other words, "whether the race-based transfers were better suited to address the police department's compelling interest in maintaining community order following Louima than any other available alternative." (A. 1133.)
 With respect to damages, the trial judge instructed the jury that if it found in favor of a plaintiff on any claim, it could award damages to compensate the plaintiff for his or her injuries, including "lost wages or lost promotion and career opportunities, as well as damages for physical pain and suffering, mental anguish, shock, fear, humiliation, and discomfort." (A. 1133.) However, the jury could only award damages for emotional distress on the constitutional claim if plaintiffs provided "convincing evidence that their emotional distress over the 70th Precinct transfers resulted in physical manifestations."[4] (A. 1134.) The court informed the jury that nine of the 24 plaintiffs — Robert Drayton, Silas Plunkett, Phillip Tai, Lavern Stuger, John Robertson, Peggy Alves, Margo McKenzie, Oscar Espinal, and Missie Lewis-Manning — had presented physical evidence of emotional distress. (A. 1134.)
 On the afternoon of the first day of deliberations, the jury announced that it had reached a verdict. The jury found that only one plaintiff, Oscar Espinal, had suffered an adverse employment action and found in favor of Espinal on the Title VII claim. (A. 1171.) With respect to the equal protection claim, the jury found that the City had failed to establish a compelling state interest justifying the transfer of plaintiffs into the 70th Precinct based on their race and therefore found for plaintiffs on their equal protection claims. The jury awarded $50,000 "compensatory damages" to each plaintiff.
 Judge Scheindlin determined that, in light of her instruction that only nine plaintiffs could recover damages for emotional distress, the jury's award of $50,000 to each of 24 plaintiffs was inconsistent with only one plaintiff having suffered employment discrimination and only nine plaintiffs having suffered emotional distress with physical manifestations. (A. 1171.) She therefore read a supplemental instruction to the jury that "mental anguish, shock, fear, humiliation and discomfort, as a matter of law, are part of emotional distress." (A. 1173.) The court then instructed the jury to resume deliberations, and stated that the jury was entitled to reconsider or stand by its findings on liability, "[b]ut then when you face damages on the 1983 charge, you have to decide what the damages are that you are compensating for...." (A. 1174.)
 The next day, the judge read a second supplemental charge modifying her earlier instruction on damages:
 If you determine that a plaintiff's evidence of emotional distress is corroborated by other testimony, then you need not find a physical manifestation of such distress. In determining whether a plaintiff's testimony of emotional injury is corroborated, you may consider the testimony of other officers as possible corroboration.
 (A. 1189.) In response to a subsequent question from the jury asking for a definition and examples of corroboration, the court stated that "[c]orroboration is any evidence other than a plaintiff's own testimony that supports that testimony" and declined to give examples. (A. 1194.)
 Three hours later, the jury returned with its second verdict. As in the first verdict, it found that only Espinal had suffered an adverse employment action, but that the City was liable on the § 1983 claim. Once again, the jury awarded $50,000 to each of the plaintiffs. The foreperson stated that all the damages were for emotional distress, with the damages for nine plaintiffs based on physical symptoms and the damages for the other plaintiffs based on corroborating evidence. (A. 1196-97.)
 After the verdict, defendants renewed their motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and also moved for a new trial pursuant to Fed.R.Civ.P. 59. The court denied the motions, see Patrolmen's Benevolent Ass'n of New York, Inc., v. City of New York, 2000 WL 1538608 (2000), and this appeal followed.
 II. DISCUSSION
 
 A. Motion for Judgment as a Matter of Law
 
 We review de novo a decision on a motion for judgment as a matter of law, applying the same standard as the district court. See Dailey v. Societe Generale, 108 F.3d 451, 455 (2d Cir.1997). The motion should be denied unless, "viewed in the light most favorable to the nonmoving party, `the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir.1993) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970)).
 The City contends that it is entitled to judgment as a matter of law 1) on the Title VII claim because plaintiff Espinal did not suffer an adverse employment action and 2) on the equal protection claim because the race-based transfers were justified by the City's compelling state interest in law enforcement. Because we find that the jury's verdict was supported by adequate evidence, we affirm the district court's denial of judgment as a matter of law on both claims.[5]
 1. Espinal's Title VII Claim
 Title VII forbids an employer from discriminating against employees with respect to the "compensation, terms, conditions, or privileges of employment," or "limit[ing], segregat[ing], or classify[ing]... employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" on the basis of race. 42 U.S.C. § 2000e-2(a).
 To constitute an adverse employment action in violation of Title VII, a change in working conditions must be "materially adverse." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000). A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." Id. (internal quotation and citation omitted). See also Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.1997). A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way. See de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs., 82 F.3d 16, 21 (2d Cir.1996) (transfer to "less prestigious" unit of social services department with reduced opportunities for professional growth was adverse employment action); Rodriguez v. Board of Educ., 620 F.2d 362, 366 (2d Cir.1980) (transfer of experienced middle school art teacher to elementary school constituted adverse action).
 At trial, Espinal testified that prior to joining the NYPD, he had received training in domestic violence issues and had worked as a caseworker for agencies serving domestic violence victims. (A. 628.) Upon joining the police force, he was assigned to the 68th Precinct where he requested and was granted work in the domestic violence unit. When Espinal was transferred to the 70th Precinct, he unsuccessfully sought an assignment as a domestic violence officer. (A. 630.) Espinal further testified that community members in the 70th Precinct shouted abusive comments at him, and he feared for his safety because the level of mistrust among the other officers in the precinct prevented the open communication necessary to effective police work. (A. 630, 631.) The jury was entitled to conclude from the above testimony, if it so chose, that the transfer had a sufficiently material negative impact on the terms and conditions of Espinal's employment with the NYPD to constitute an adverse employment action.
 2. Equal Protection Claim
 In seeking to overturn the jury's finding that the race-based transfers violated the Equal Protection Clause, the City faces a particularly steep uphill climb. It is well-established that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." Regents of the University of California v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Justice Powell). Accordingly, all racial classifications imposed by a government actor "must be analyzed by a reviewing court under strict scrutiny." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). To survive that strict scrutiny, a racial classification must be narrowly tailored to further a compelling governmental interest. Id. See also Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); United States v. Secretary of Housing and Urban Development, 239 F.3d 211, 218-19 (2d Cir.2001) cert. denied, ___ U.S. ___, 122 S.Ct. 643, 151 L.Ed.2d 562 (Dec. 3, 2001).
 The remediation of past discrimination is the only compelling state interest explicitly recognized as such by the Supreme Court. See United States v. Paradise, 480 U.S. 149, 167, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); Wygant, 476 U.S. at 274-75, 106 S.Ct. 1842. See also Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir.2002); Susan M. Maxwell, Note, Racial Classifications Under Strict Scrutiny: Policy Considerations and the Remedial-Plus Approach, 77 Tex. L.Rev. 259 (1998). However, the City does not seek to justify the race-based transfers on this ground. Instead, the City argues that the transfers were justified by its compelling interest in effective law enforcement. We have recognized that "a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves," may constitute a compelling state interest, Barhold v. Rodriguez, 863 F.2d 233, 238 (2d Cir.1988), and several courts have relied on the "operational need" of law enforcement and correctional agencies to uphold hiring or assignment practices that favored minorities, even in the absence of past discrimination. See, e.g., Talbert v. City of Richmond, 648 F.2d 925, 931-32 (4th Cir.1981); Wittmer v. Peters, 87 F.3d 916, 921 (7th Cir.1996); Reynolds, 296 F.3d at 530-31; Minnick v. Dep't of Corrections, 95 Cal.App.3d 506, 520-21, 157 Cal.Rptr. 260, 268-69 (1979).
 The mere assertion of an "operational need" to make race-conscious employment decisions does not, however, give a police department carte blanche to dole out work assignments based on race if no such justification is established. The assignment of police officers to certain neighborhoods or tasks because of their race has been rightly held to run afoul of the Fourteenth Amendment. See, e.g., Baker v. City of St. Petersburg, 400 F.2d 294, 300 (5th Cir. 1968). Mindful of the potential for abuse in an "operational need" defense to race-based employment actions, courts recognizing the defense have required the government actor to demonstrate that it is "motivated by a truly powerful and worthy concern and that the racial measure ... adopted is a plainly apt response to that concern." Wittmer, 87 F.3d at 918. The justification must be substantiated by objective evidence — mere speculation or conjecture is insufficient. Id. at 918-19; see also McNamara v. City of Chicago, 138 F.3d 1219, 1222 (7th Cir.1998); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 213-14 (4th Cir.1993).
 Further, the race-based measure must be narrowly tailored to serve the identified interest. "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." Fullilove v. Klutznick, 448 U.S. 448, 537, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (dissenting opinion of Justice Stevens). In determining whether a race-based measure is narrowly tailored, courts consider factors such as the need for the measure, the efficacy of alternative measures, and the flexibility and duration of the measure. See Paradise, 480 U.S. at 171, 107 S.Ct. 1053; U.S. v. Secretary of HUD, 239 F.3d at 219 (both discussing narrow tailoring in the context of remedial affirmative action plans).
 At trial, the jury heard testimony from police officials that there was no rioting, looting, or other violence in the 70th Precinct itself following the Louima incident. Commissioner Safir testified that he believed the NYPD had to act quickly to respond to the threat of violence, but rather than ordering immediate, temporary transfers, chose to enact permanent transfers through normal NYPD channels that took several weeks to take effect. (A. 461-62.) Plaintiffs' expert Dr. Leinen testified that the City could have more effectively responded to community concerns by assigning Creole-speaking Haitian-American officers and officers trained in police-community relations to the precinct. From this testimony, the jury could reasonably have concluded that the City had not demonstrated that the transfers were narrowly tailored to meet a compelling state interest.
 Appellants contend that "common knowledge" regarding the "historical reality" of race relations in police work suffices to justify the City's actions. As noted above, strict scrutiny by this Court requires more than the assumption that a racial classification is an appropriate response to a state interest. "Argument in so sensitive an area of human relations must not ... be allowed to draw on `common sense,' which might be inflected by stereotypes." Reynolds, 296 F.3d at 526. Appellants have identified academic literature and case law supporting the general proposition that increased minority representation on a police force may improve police-community relations. (Appellant Br. at 39-42, (citing Race as an Employment Qualification to Meet Police Department Operational Needs, 54 N.Y.U. L.Rev. 413 (1979) and Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 695-96 (6th Cir.1979))). However, it can scarcely be denied that in individual cases the assignment of minority officers to minority neighborhoods or to dangerous or otherwise unattractive tasks on the basis of their race may impede those very goals by decreasing the officers' willingness to serve on the police force, as well as their morale and self-esteem. See (A. 394, 570, 624); Young, 608 F.2d at 693; Baker, 400 F.2d at 300, n. 9. The difficulty of balancing such competing interests underscores the need for particularized evidence of a compelling state interest.
 Appellants also urge that the jury should not be allowed to "second guess" the Commissioner's decision to implement the transfers, since the decision was made in the context of the emergency situation following the brutalization of Abner Louima. Such unconditional deference to a government agent's invocation of "emergency" to justify a racial classification has a lamentable place in our history, see Korematsu v. United States, 323 U.S. 214, 223, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding internment of Japanese-Americans based on wartime security concerns), and we are not inclined to repeat the same mistakes today. See Adarand, 515 U.S. at 236, 244, 275, 115 S.Ct. 2097 (Justice O'Connor for the Court, Justice Stevens in dissent and Justice Ginsburg in separate dissent, criticizing Korematsu); see also 50 U.S.C.App. § 1989.
 
 
 1
 There may indeed be occasions where race-conscious transfer of police officers is a constitutionally permissible means of improving law enforcement, whether as a long-term strategy to create a diverse police force, see Barhold, 863 F.2d at 238, or as an immediate response to an emergency situation. See Wygant, 476 U.S. at 314, 106 S.Ct. 1842 (dissenting opinion of Justice Stevens); Baker, 400 F.2d at 300-01, n. 10. The jury concluded that this was not such an occasion. Since the evidence reasonably supported the jury's verdict, we conclude that the district court correctly denied the motion for judgment as a matter of law.
 
 
 B. Motion for a New Trial
 
 
 2
 We review a district court's decision on a motion for a new trial for abuse of discretion. Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir.1992). The motion for a new trial "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Atkins v. New York City, 143 F.3d 100, 102 (2d Cir.1998) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir.1997)). The City claims it is entitled to a new trial because 1) the jury charge on the "narrowly tailored" standard was erroneous; 2) the court's supplemental instructions "pushed" the jury to award damages to all plaintiffs; 3) the charge on emotional distress damages was prejudicially vague. In addition, the City contends that the damage award should be reduced to nominal amounts since plaintiffs failed to provide independent evidence of emotional distress. We find that the denial of the new trial motion was not an abuse of discretion.
 
 1. "Narrowly Tailored" Jury Charge
 
 3
 The City did not object to the court's instruction on the "narrowly tailored" prong of the strict scrutiny test at trial. We therefore review the instruction for "fundamental error;" that is, an error "so serious and flagrant that it goes to the very integrity of the trial." Shade v. Housing Auth. of New Haven, 251 F.3d 307, 312-13 (2d Cir.2001) (citations omitted). The trial court's instruction on "narrowly tailored" could not possibly have affected the integrity of the trial, since the jury, having determined that the City had failed to establish a compelling state interest, did not go on to consider whether the transfers were narrowly tailored.[6] (A. 1195-96, 1373-74.) Any error in the instructions relating to this standard was harmless. See United States v. Masotto, 73 F.3d 1233, 1239 (2d Cir.1996); Richards v. City of Topeka, 173 F.3d 1247, 1253 (10th Cir.1999).
 
 
 4
 2. Prejudicial Effect of Supplemental Jury Charge
 
 
 5
 If the jury returns an inconsistent verdict, the trial judge has the discretion to resubmit the issues to the jury with a request for clarification. See Fed. R.Civ.P. 49(b) (court may either return the jury for further consideration of its answers to the interrogatories or order a new trial); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 891 (2d Cir.1988). Since the trial judge is in the best position to determine if a jury's answers are inconsistent, we review the decision for abuse of discretion. See Kerman v. City of New York, 261 F.3d 229, 244 (2d Cir.2001). The trial judge initially concluded that the jury's award of $50,000 to each plaintiff was inconsistent with its finding that only one plaintiff had suffered an adverse employment action and the court's initial refusal to allow the jury to award damages for emotional distress unless the plaintiff showed physical manifestations. The court, however, then relaxed the standard for proving emotional distress, allowing an award without a showing of physical manifestation if the plaintiff put forth evidence corroborating the claim. We find no error. Furthermore, we see no indication that the district court "pushed" the jury in her supplemental charges to reach a certain verdict, especially since the jury returned essentially the same verdict after hearing the supplemental charges.
 
 3. Emotional Distress Damages
 
 6
 "A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 135 (2d Cir.1999) (quoting Hathaway v. Coughlin, 99 F.3d 550, 552 (2d Cir.1996)). In evaluating a jury charge, we look to the charge as a whole, and will reverse the jury verdict "only if we are persuaded `that the error was prejudicial or the charge was highly confusing.'" Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 119 (2d Cir.1999) (quoting Warren v. Dwyer, 906 F.2d 70, 73 (2d Cir.1990)).
 
 
 7
 It is well-established that courts may award emotional distress damages in section 1983 cases. Miner v. City of Glens Falls, 999 F.2d 655, 662 (2d Cir. 1993). However, the mere fact that a constitutional deprivation has occurred does not justify the award of such damages; the plaintiff must establish that she suffered an actual injury caused by the deprivation. See Carey v. Piphus, 435 U.S. 247, 263-64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The damage award "must be supported by competent evidence concerning the injury." Id. at 264, n. 20, 98 S.Ct. 1042. A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. See, e.g., Cohen v. Bd. of Educ., 728 F.2d 160, 162 (2d Cir.1984); Annis v. County of Westchester, 136 F.3d 239, 249 (2d Cir. 1998). Cf. Price v. City of Charlotte, 93 F.3d 1241, 1254 (4th Cir.1996). Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, see Miner, 999 F.2d at 663, or the objective circumstances of the violation itself. See id.; Walz v. Town of Smithtown, 46 F.3d 162, 170 (2d Cir.1995). Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, see, e.g., Carrero v. New York City Hous. Auth., 890 F.2d 569, 581 (2d Cir.1989), is not required. Miner, 999 F.2d at 663.
 
 
 8
 In Annis, we found that the plaintiff had failed to submit sufficient evidence to support emotional distress damages because
 
 
 9
 the only evidence of [plaintiff's] emotional distress — her own testimony — is insufficient to warrant an award of compensatory damages for that injury. She has not alleged any physical manifestations of her emotional distress, and despite the discrimination she remained a lieutenant with the County police. She testified that she needs and has counseling, but introduced no affidavit or other evidence to corroborate her testimony. In short, her testimony fails to establish that she suffers from any concrete emotional problems.
 
 
 10
 136 F.3d at 249 (internal citations omitted). Judge Scheindlin relied on Annis in her original instruction to the jury that only those plaintiffs alleging physical manifestations of emotional distress could recover for emotional distress damages in section 1983 cases. (A. 1184.) In her supplemental charge, she amended her instruction to state that emotional distress could be proved either by physical manifestations or by the plaintiff's testimony "corroborated by other testimony."
 
 
 11
 We agree that Annis should not be read to require physical symptoms of emotional distress in cases brought pursuant to 42 U.S.C. § 1983. While the district court's instructions on the issue could have been clearer, they were not so confusing or prejudicial to the City to warrant overturning the jury verdict.
 
 
 12
 Finally, the testimony at trial was sufficient to support the jury's damage awards. Having concluded that emotional distress damages were properly awarded, we may only reduce the award if the amount "shocks the conscience." See, e.g., Walz, 46 F.3d at 170; Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990). In making this determination, we look to amounts awarded in similar cases. Id. The jury's award of $50,000 per plaintiff is well within the range of acceptable awards for emotional distress in civil rights cases. See, e.g., Walz, 46 F.3d at 170 (damages ranging from $20,400 to $40,800); Phillips v. Bowen, 278 F.3d 103, 111-12 (2d Cir.2002) (damages of $400,000); Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 884 (2d Cir.1988) (damages of $575,000).
 
 III. CONCLUSION
 
 13
 We find that the jury could reasonably conclude from the evidence adduced at trial that plaintiff Espinal suffered an adverse employment action upon being transferred to the 70th Precinct and that the City's race-based transfers violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The trial judge adequately instructed the jury on the applicable law and the damages awarded were not excessive. Accordingly, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Sidney H. Stein of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 References to "A. ___" are to the appropriate page of the joint appendix on appeal
 
 
 [3]
 The verdict sheet phrased this somewhat differently, as follows: "Did defendants prove, by a preponderance of the evidence, that the transfer of plaintiffs into the 70th Precinct based on their race wasnecessary to maintain effective law enforcement and to ensure public safety in the wake of the Louima incident?" (A. 1363) (emphasis added). Just as the City did not object to the instruction, it did not object to the verdict sheet.
 
 
 [4]
 The district court's instruction on emotional distress damages was as follows:
 In order to prove injury resulting from emotional distress under sections 1981 and 1983, plaintiffs must demonstrate, by a preponderance of the evidence, that they suffered "concrete" emotional problems. Concrete emotional problems may be established through evidence of physical manifestations of emotional suffering, such as sleeplessness, headaches, loss of appetite, crying spells, or trembling. Plaintiffs are not required to demonstrate that they sought medical treatment for their distress, nor are they required to present corroborating evidence of that distress from doctors, clergy, or family members. However, plaintiffs must provide convincing evidence that their emotional distress over the 70th Precinct transfers resulted in physical manifestations. Evidence of emotional suffering absent such physical manifestation is insufficient to prove concrete injury leading to recovery of damages, and I stress again that is only with respect to [sections] 1981 and 1983 [the claims for violation of equal protection], not Title VII.
 (A. 1134.)
 
 
 [5]
 To the extent that appellants request a new trial on these claims on the grounds that the verdict was against the weight of the evidence, (Appellant Br. at 62, 79), that request must be denied because it was not raised before the trial judgeSee Scientific Holding Co. v. Plessey, Inc., 510 F.2d 15, 28 (2d Cir. 1974); (A. 1383).
 
 
 [6]
 As noted previously, the verdict sheet instructed the jury that in order to find a compelling state interest it had to conclude that the race-based transfers were "necessary to maintain effective law enforcement and to ensure public safety." We have considerable doubt that the instruction was proper, focusing as it did on the issue of whether the City had demonstrated that the transfers were "necessary," rather than whether the City had demonstrated a compelling state interest. Had the jury been given an instruction that avoided the question of necessity, it might well have reached a different verdict. However, as the City neither objected in the district court, nor raised the issue on appeal, we have no occasion to consider it