**David A. FULLARD, Plaintiff,**

v.

**The CITY OF NEW YORK, Defendant.**

**No. 01 Civ. 4356(JCF).**

United States District Court,
S.D. New York.

June 19, 2003.

Marshall M. Kolba, Lewis M. Steel, Richard F. Bellman, Steel Bellman Ritz & Clark, P.C., New York City, for Plaintiff.

Kevin Dantzler, Diana E. Goell, Assistant Corporation Counsel, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

FRANCIS, United States Magistrate Judge.

This is a civil rights action in which David A. Fullard, a captain in the New York City Department of Correction, alleges that he was discriminated against on the basis of race and retaliated against for asserting his rights. Specifically, the plaintiff contends that he was denied a post assignment and subjected to a hostile work environment because he is African–American and that he was later transferred to an undesirable post in retaliation for complaining about the discrimination. Captain Fullard asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983; the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.;* and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* The parties consented to trial of this case before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and waived their right to a jury. A bench trial was held on September 30 and October 2, 7, and 8, 2002, and this opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Background

David A. Fullard received his Bachelor of Fine Arts Degree from the School of Visual Arts in Manhattan in 1981. (Tr. 11; Pl. Exh. 19).[1] After working as a photographer for the New York City Police Department, he joined the New York City Department of Correction ("DOC") as a correction officer on June 30, 1982. (Tr. 13; Pl. Exh. 19). While employed by DOC, the plaintiff earned masters degrees in criminal justice and in forensic psychology at the John Jay College of Criminal Justice in Manhattan and worked toward a doctoral degree in clinical psychology at the Union Institute in Cincinnati. (Tr. 11–12; Pl. Exh. 19).

In May 1988, after having passed the qualifying examination, Mr. Fullard was promoted to the rank of captain. (Tr. 16–17; Pl. Exhs. 13, 14). When he had completed the academy training for captains, the plaintiff was rotated through various units of DOC until he was assigned to the Bronx House of Detention for Men ("Bronx HDM") on June 15, 1993. (Tr. 20; Pl. Exh. 19). At Bronx HDM, Captain Fullard initially served in a number of different posts in order to learn the facility, and he then applied and was accepted

---

**1.** "Tr." refers to the trial transcript and "Exh." refers to exhibits admitted during the trial.

for the post of Intake Captain. (Tr. 20–24).

In September 1995, an opening was announced for the post of Programs Captain at Bronx HDM. (Tr. 24–25; Pl. Exh. 2). According to the notice, the criteria for selection were "job performance, record, seniority and competency for the assignment." (Pl.Exh. 2). Under the category "special skills required," the notice listed "résumé required" and "knowledge of the post helpful." (Pl.Exh. 2).

The responsibilities of the Programs Captain were outlined in an institutional order issued by Hector L. Eugui, Warden of Bronx HDM. (Pl.Exh. 1). In general terms, these duties included "organizing and coordinating all inmate programs" and "supervision of all inmate Recreational services including Gymnasium, Chapel, and roof activities." (Pl.Exh. 1). Among other things, the Programs Captain was expected to ensure the proper functioning of all program areas; act as liaison with school programs; exercise direct responsibility for the libraries, arts and crafts programs, and clinics; provide training to program personnel; and coordinate functions such as substance abuse programs, youth programs, and inter-institutional visits. (Pl. Exh. 1).

Captain Fullard applied for the Programs Captain post, submitting his curriculum vitae and a cover memorandum. (Tr. 24–26). According to the announcement of the opening, applications were to be accepted until October 3, 1995. (Pl.Exh. 2). However, prior to that date, Captain Fullard was told by Captain Joyce James, an African–American woman who had also applied, that a white officer, Captain Raymond Scherer, had already been selected for the position. (Tr. 36–37). When it was announced on October 13, 1995 that, in fact, Captain Scherer had been awarded the post, Captain Fullard submitted a complaint to the DOC Deputy Commissioner for Equal Employment Opportunity. (Tr. 36–37; Pl. Exh. 22). In it, he argued that the selection process had deviated from DOC regulations because it was based in part on supervisor evaluations. Captain Fullard also questioned whether the decision was racially motivated. He stated that he had learned on October 11 that the selection of Captain Scherer had been preordained. (Pl.Exh. 22).

On October 16, 1995, Captain Fullard met with Deputy Warden James Lasser, who had jurisdiction over the Programs Captain position. (Tr. 41–42). According to Captain Fullard, he intended to voice his concern over the rumor he had heard from Captain James about the way that the post was awarded. (Tr. 42). However, when he began to explain why he thought he was the best qualified candidate and alluded to his advanced degrees, Deputy Warden Lasser purportedly launched into a tirade in which he said:

> All you blacks are just alike-you think because you have a little education that you will get whatever the fuck you want! Well, I'm here to tell you that you will get nothing but the Intake; the Programs Captain post is not slated for a black captain here in [Bronx HDM.] I run the show here and, as a manager, I can do whatever I want and you can't be saved by Officer Labor relations because you can't grieve my decision. Now get the fuck out of my office!

(Pl. Exhs. 20A, 20B, 20C; Tr. 44–45). When Captain Fullard left, he returned to his office and allegedly wrote down in his memo book what Deputy Warden Lasser had told him. (Tr. 46–47; Pl. Exhs. 20B, 20C). He again memorialized the conversation in a memorandum to the file dated October 27, 1995. (Tr. 49–50; Pl. Exh. 20A).

Captain Fullard then met with Warden Eugui on October 25, 1995. (Tr. 53). He asked Captain James to accompany him because she was a delegate of the Guardians Association, a fraternal organization of African–American law enforcement officers. (Tr. 53). However, he did not tell Captain James about the racial statements made to him by Deputy Warden Lasser. (Tr. 56). In the meeting with Warden Eugui, Captain Fullard again expressed concern over the post selection process. (Tr. 54). He did not, however, tell Warden Eugui about his meeting with Deputy Warden Lasser. (Tr. 54–56).

Unsatisfied with the response he received from Warden Eugui, Captain Fullard filed a formal grievance concerning the awarding of the post. (Tr. 56; Pl. Exh. 10). He asked whether the decision was racially motivated but did not mention his meeting with Deputy Warden Lasser. (Pl.Exh. 10). Warden Eugui responded in a short memorandum, noting that assignment of posts is a management prerogative that is not grievable. He further stated that the management team of Bronx HDM had determined that Captain Scherer was the best candidate for the position. (Pl.Exh. 11).

Shortly after this, Captain Fullard was transferred out of Bronx HDM to a post in the Applicant Investigation Unit. (Tr. 58). According to the plaintiff, this transfer was intended to separate him from uniformed correction officers after he had given evidence concerning use of excessive force at a DOC facility. (Tr. 58–59). Captain Fullard was satisfied with this assignment and served there about six months. (Tr. 60).

In the spring of 1996, Captain Fullard met with an attorney in the Civil Rights Division of the United States Attorney's Office for the Eastern District of New York and discussed what he believed to be the discriminatory assignment of posts at DOC. (Tr. 77; Pl. Exh. 15). The Assistant United States Attorney apparently then sent a letter of inquiry to DOC seeking information about assignment policies and asking for the personnel files of several officers, including Captain Fullard. (Pl. Exhs.15, 16). Within weeks, the plaintiff was transferred to the DOC Toxicology Unit, which is responsible for collecting urine specimens in order to test officers for the use of controlled substances. (Tr. 65, 77–78). Captain Fullard considers this post a step backward in his career since the duties are routine and do not allow him to exercise his skills. (Tr. 65–66).

On August 3, 1996, Captain Fullard filed a charge of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC"). (Pl.Exh. 23). He alleged that he had been denied the position of Programs Captain because of his race, had been subjected to a hostile working environment because supervisors, including Deputy Warden Lasser, used racial epithets, and had been retaliated against by being transferred to the Toxicology Unit. (Pl.Exh. 23). On September 30, 1998, the EEOC issued a determination finding reason to believe that each of the charged violations had occurred. (Pl.Exh. 6). When the parties were unable to resolve their differences, the plaintiff filed the instant action.

At trial, Warden Eugui testified that the decision to award the Programs Captain post was based on at least four factors: seniority, work performance, attendance record, and any special skills. (Tr. 441). Warden Eugui did not consider this list exhaustive and did not assign relative weight to the factors. (Tr. 441). In addition, he relied on the recommendation of Deputy Warden Lasser. (Tr. 441–42, 445). Warden Eugui indicated that Captain Fullard and Captain Scherer were equal in seniority since they had been appointed

captain on the same date, even though Captain Fullard had joined DOC earlier as a correction officer. (Tr. 448). Neither candidate appeared to have had any attendance or disciplinary problems since becoming a captain, though Captain Scherer received a designation for chronic absence while a correction officer. (Pl. Exhs.13, 21B).[2] With respect to special skills, Warden Eugui indicated that Captain Scherer had a longer tenure at the Bronx HDM and so was more familiar with the facility. (Tr. 449). At the same time, Warden Eugui discounted Captain Fullard's educational credentials, as he considered them irrelevant. (Tr. 453–54). According to Warden Eugui, although the Programs Captain is responsible for logistics and security in the program areas, he has no influence on the content of those programs. (Tr. 456, 471–72).

As a practical matter, Warden Eugui did not make a factor-by-factor comparison between Captains Fullard and Scherer at the time he awarded the post. (Tr. 486–87). Rather, because Deputy Warden Lasser had endorsed Captain Scherer, Warden Eugui followed that recommendation in the absence of a compelling reason to question it. (Tr. 486–87; Pl. Exh. 13). Warden Eugui announced the appointment in a memorandum dated September 21, 1995, though he testified that the date was a typographical error. (Pl. Exh. 5; Def. Exh. D; Tr. 451).

With respect to Captain Fullard's transfer to the Toxicology Unit, Warden Eugui suggested that this was a desirable posting because it did not involve contact with inmates. (Tr. 457). Further, if Captain Fullard was dissatisfied with that position, he could have requested a transfer after six months, something he did not do. (Tr. 457).

Additional facts will be discussed in connection with the analysis of the issues to which they relate.

*Discussion*

A. *Denial of Programs Captain Post*

Traditionally, employment discrimination claims are analyzed in accordance with the three-part framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the first stage of the *McDonnell Douglas* analysis, the plaintiff must establish a prima facie case of discrimination by showing (1) that he is within a protected group. (2) that he was qualified for the job at issue, (3) that he was subjected to an adverse employment action, and (4) that this action occurred under circumstances giving rise to an inference of discrimination. *Id.* at 802, 93 S.Ct. 1817; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the defendant provides evidence of legitimate nondiscriminatory reasons for its action, the burden returns to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450

---

**2.** He was also cited for absences as a captain, but he successfully appealed by producing evidence of illness. (Pl.Exhs.21A, 21B).

U.S. at 253, 101 S.Ct. 1089. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.; see also St. Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. 2742.

 In this case, it is unnecessary to go through a mechanical application of the *McDonnell Douglas* analysis. First, that framework is useful primarily in situations where the evidence of discrimination is circumstantial; where there is direct proof of discriminatory intent, the burden-shifting scheme is superfluous. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir.2001). Here, the plaintiff proffered direct evidence of discriminatory animus including the statements allegedly made to him by Deputy Warden Lasser. Second, the *McDonnell Douglas* regimen is designed to "guide a judge in determining whether a case should go to the jury." *Gordon v. New York City Board of Education,* 232 F.3d 111, 118 (2d Cir.2000). At trial, the responsibility of the fact-finder "is simply to decide whether an impermissible factor was a motivating factor in the adverse employment action."[3] *Id.* In this case, the parties dispute both whether Captain Fullard was subject to an adverse employment action and, if so, whether that action was based on his race.

### 1. *Adverse Employment Action*

DOC contends that Captain Fullard's Title VII claim must fail because denying him the Programs Captain post did not constitute an adverse employment action. The defendant notes that the transfer would not have entailed an increase in pay, an increase in salary, or greater opportunity for promotion. (Tr. 375, 421, 454). Indeed, because that position involves working a steady daytime shift, Captain Fullard would not have been entitled to the ten percent differential in pay that he sometimes received as Intake Captain for working the night shift. (Tr. 90, 360, 445).

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Although the statutory language includes no reference to the prerequisite of demonstrating an "adverse employment action," courts have adopted that requirement as an aid to defining what constitutes the "terms" and "conditions" of employment and as a means for filtering out claims where the employer's action has had only a *de minimis* effect on the employee. Because the adverse employment action requirement does not by its terms appear in Title VII, courts must be cautious not to interpret it too stringently, lest some litigants whom the statute was intended to protect be left without a remedy.[4]

The Second Circuit recently summarized the relevant guidelines:

---

**3.** The standards that apply to Title VII employment discrimination claims are identical to the legal principles applicable to the plaintiff's claims under the New York Human Rights Law and the Administrative Code of the City of New York. *See Weinstock v. Columbia University,* 224 F.3d 33, 42 n. 1 (2d Cir. 2000). The Title VII analysis also applies in critical respects to the plaintiff's claims under

42 U.S.C. §§ 1981 and 1983. Although the plaintiff does not explicitly identify in his complaint the substantive right he seeks to enforce under § 1983, he has subsequently made clear that he is asserting an equal protection claim. (Letter of Lewis M. Steel dated June 11, 2003).

**4.** One can imagine an employment action that is clearly discriminatory but affects the nature

To constitute an adverse employment action in violation of Title VII, a change in working conditions must be "materially adverse." *Galabya v. New York City Board of Education,* 202 F.3d 636, 640 (2d Cir.2000). A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (internal quotation and citation omitted). *See also Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way. *See de la Cruz v. New York City Human Resources Administration Department of Social Services,* 82 F.3d 16, 21 (2d Cir.1996) (transfer to "less prestigious" unit of social services department with reduced opportunities for professional growth was adverse employment action); *Rodriguez v. Board of Education,* 620 F.2d 362, 366 (2d Cir. 1980) (transfer of experienced middle school art teacher to elementary school constituted adverse action).

*Patrolmen's Benevolent Association of the City of New York v. City of New York,* 310 F.3d 43, 51 (2d Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003).

However, some courts also suggest that " 'subjective dissatisfaction with assignments does not constitute adverse employment action.' " *Brown v. Snow,* No. 02 Civ. 7985, 2003 WL 1907974, at *4 (S.D.N.Y. April 17, 2003) (quoting *Harrison v. New York City Off–Track Betting Corp.,* No. 99 Civ. 6075, 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001)). This additional qualification may be problematic. If it means only that there must be some objectively discernable change in the terms and conditions of the plaintiff's job caused by the employer's action, then it is unobjectionable. But if it is meant to imply that there must be a consensus that the change is deleterious, then the requirement is too restrictive. Certainly, in some cases there will be general agreement about the "objective" aspects of an adverse employment action. For example, if an employee is moved from one position to another that is identical in all material respects except that the employee is now paid less, the action is surely adverse. But changes in the conditions of employment often involve multiple characteristics, some of which may be positively affected by the change, others negatively. For instance, an increase in salary may be accompanied by a less flexible schedule, greater responsibilities by assignment to a less desirable location. When the comparison between prior and current positions is multidimensional, it quickly becomes impossible to identify the change as categorically favorable or unfavorable.

 In this case, the assignment of captains' posts within DOC is an objectively material change in the conditions of employment. The fact that candidates submit applications for posts is evidence that

---

of the job only marginally. For example, an employer with a janitorial staff might assign only its minority employees to cleaning the bathrooms. Although that work may be no more demanding than other janitorial tasks, it would no doubt be considered demeaning. An employer who created such a caste system would not be immune from Title VII simply because its janitorial employees all receive equal pay and work the same hours.

positions are not interchangeable. Of course, a bidding process could simply reflect the need for some assignment mechanism that would satisfy the subjective preferences of the employees in the allocation of jobs. But DOC did not treat the posts as fungible by assigning them, for example, on the basis of seniority alone. Rather, in selecting a candidate for Programs Captain, Warden Eugui specifically required submission of a résumé and identification of special skills. This implies that selection was based on unique attributes of the position.

Moreover, Captain Fullard presented ample evidence that the denial of the transfer was adverse to him. The Programs Captain post was a steady tour that provided the certainty of working the day shift only. It provided greater opportunity for advancement because it involved responsibilities commensurate with the plaintiff's skills and thus offered a better chance for successful performance. It is true that Warden Eugui testified that Captain Fullard's background would be irrelevant because the Programs Captain was responsible only for security and control of the activities, not for the content of the programs. (Tr. 453, 456, 471). That testimony is not persuasive, however, because it conflicts both with the written job description (Pl.Exh. 1) and with Warden Eugui's own published criteria for selection. (Pl.Exh. 2). If the position entailed only overseeing the movement of inmates, it is hard to understand what "special skills" would be pertinent or why a resume was required.

■ An assignment that is "materially less prestigious, materially less suited to [the plaintiff's] skills and expertise, or materially less conducive to career advancement" is an adverse employment action. *See Galabya*, 202 F.3d at 641. Thus, exclusion from positions that "enhance[ ] an

employee's skill set and may lead to promotional opportunities" is an adverse determination. *See Ewing v. Coca Cola Bottling Co. of New York*, No. 00 Civ. 7020, 2001 WL 767070, at *6 (S.D.N.Y. June 25, 2001); *see also Brown*, 2003 WL 1907974, at *3; *Little v. National Broadcasting Co.*, 210 F.Supp.2d 330, 381 (S.D.N.Y.2002) (denial of high-profile assignment); *Bogart v. New York City Law Department*, No. 00 Civ. 7417, 2001 WL 1631986, at *9 (S.D.N.Y. Dec. 20, 2001) (diminishing responsibilities of employee).

■ A transfer or other change in employment conditions may therefore be deemed adverse based on the unique qualifications and career path of a particular employee. Two examples illustrate this principle. In *Patrolmen's Benevolent Association*, 310 F.3d at 51–52, the Second Circuit found that the transfer of a police officer from one precinct to another could be considered adverse because, among other things, he was not assigned to a unit that utilized his training and experience in domestic violence issues. Similarly, in *Hurdle v. Board of Education of the City of New York*, No. 01 Civ. 4703, 2002 WL 31834454, at *3 (S.D.N.Y. Dec. 16, 2002), the court held that the transfer of a principal from supervising a school to an assignment in the district office was an adverse employment action in part because the plaintiff had the education and experience to run a school but was not provided the training to perform her new functions. Captain Fullard's situation parallels these cases: he was denied the opportunity of a post that would have matched his education and training and thus would have maximized his chances for success and advancement. He was therefore subjected to an adverse employment action.

*2. Discriminatory Intent*

■ "The 'ultimate issue' in an employment discrimination case is whether the

plaintiff has met [his] burden of proving that the adverse employment action was motivated at least in part by an 'impermissible reason,' *i.e.,* a discriminatory reason." *Stratton v. Department for the Aging for the City of New York,* 132 F.3d 869, 878 (2d Cir.1997) (quoting *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 119 (2d Cir.1997)). To prevail, then, Captain Fullard must demonstrate that his race played a role in the decision not to select him to be Programs Captain.

 The most dramatic evidence that could support such a finding is the plaintiff's testimony that Deputy Warden Lasser told him explicitly that the Programs Captain was not a "black post," indicating that some posts were assigned by race. If credited, this evidence would be dispositive. For, although Warden Eugui was the ultimate decisionmaker, it is clear that he gave substantial deference in this case to the recommendation of Deputy Warden Lasser. The discriminatory animus of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation. But the employer will be liable "where the decision-maker 'rubber stamps' the ... recommendation of the subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive." *Mato v. Baldauf,* 267 F.3d 444, 450 (5th Cir.2001) (citing *Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir.1996); *Russell v. McKinney Hospital Venture,* 235 F.3d 219, 226–27 (5th Cir.2000)); *see also Llampallas v. Mini–Circuits Lab, Inc.,* 163 F.3d 1236,

1249 (11th Cir.1998). Indeed, since discriminatory animus need only be one of the motivating factors for the adverse action, not the sole factor, *see* 42 U.S.C. § 2000e–2m; *Desert Palace, Inc. v. Costa,* —— U.S. ——, —— – ——, 123 S.Ct. 2148, 2150–51, 156 L.Ed.2d 84 (2003); *Fields v. State of New York Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 120–21 (2d Cir.1997), the bias of the subordinate will support a finding of liability as long as it played a substantial role in the final decision. In this case, any bias on the part of Deputy Warden Lasser would properly be imputed to Warden Eugui. As Warden Eugui testified, he would only go behind the recommendation of a deputy warden and perform his own detailed evaluation if the recommendation appeared aberrational on its face. (Tr. 487). Therefore, Deputy Warden Lasser's discriminatory motives, if any, would have tainted the selection process.

I do not, however, credit Captain Fullard's description of his meeting with Deputy Warden Lasser. Although the shocking admission that the Programs Captain post would not be given to a black officer was purportedly made on October 16, 1995, Captain Fullard told no one about it until he engaged counsel and filed a complaint with the EEOC in August 1996.[5] He did not tell the DOC equal employment opportunity officer with whom he lodged a complaint about the selection process. He did not tell Warden Eugui. He did not tell Captain James even when he asked her to accompany him to the meeting with Warden Eugui. And, he did not tell the Assistant United States Attorney investigating

---

**5.** Carmen Rosado–Ramos, a former corrections officer, did testify that Captain Fullard told her about the alleged racial remarks sometime before the filing of the EEOC

charge. (Tr. 254–55). However, as discussed in more detail below, I do not find the testimony of Ms. Rosado–Ramos to be credible.

complaints about the assignment of posts in DOC.

Captain Fullard attributes his reticence to an inability to deal psychologically with the racism he says he encountered. He testified that he wanted to "wipe that from [his] memory" and "block it out of [his] mind." (Tr. 56). This might be plausible if Captain Fullard had avoided confronting issues of discrimination altogether. But while the plaintiff vigorously pursued his rights, he did not reveal the details of his meeting with Deputy Warden Lasser until almost a year had elapsed. Most surprisingly, he did not confide in Captain James, even though he asked her to meet with Warden Eugui precisely because she was a representative of an advocacy group for minority officers.

Captain Fullard's claim that he wanted to forget the incident with Deputy Warden Lasser is also inconsistent with his contention that he memorialized the encounter twice: in his memo book and in a memorandum to the file. Furthermore, these documents have no indicia of authenticity. No one, other than Captain Fullard himself, testified to having seen them at or about the time they were purportedly written. Nor is the critical page in the memo book linked with other entries by the sequence of dates or otherwise.

To be sure, the defendant's case was not aided by the failure to call Deputy Warden Lasser to testify. Nevertheless, I decline to draw an adverse inference based on that failure. First, this witness, who is now retired (Tr. 494), was equally available to both sides; had plaintiff's counsel considered his evidence advantageous they, too, had the means to obtain his testimony. Second, DOC was entitled to rely on the weakness of Captain Fullard's testimony and forego presenting an affirmative case. This was a risky strategy, since if I had credited the plaintiff's description of his meeting with Deputy Warden Lasser, there would have been no evidence to contradict it. But, since I do not, the failure to call Deputy Warden Lasser is ultimately immaterial.

There is, then, insufficient direct evidence to support a finding of discriminatory motive. Likewise, the circumstantial evidence presented by the plaintiff is unpersuasive. Captain Fullard argues that discriminatory animus is demonstrated by the combination of remarks Deputy Warden Lasser has made indicating general racial or ethnic bias and the fact that the reasons advanced for selecting Captain Scherer for the Programs Captain post were pretextual.

Captain Fullard testified that Deputy Warden Lasser regularly used derogatory terms when referring to racial or ethnic minorities. According to the plaintiff, Deputy Warden Lasser might say:

> [w]hat's that dumb nigger doing out of the cell, what's he walking around for, where is he going. He called Puerto Ricans spics. He used the word kike once. He used the word jew-jew....

(Tr. 43). Captain Fullard also offered the testimony of former Correction Officer Carmen Rosado–Ramos. She stated that in a conversation with Deputy Warden Lasser about finding a school for her children, he advised her to look in Westchester County, suggesting that she would rather have them placed with classmates who were "geeks or gooks" rather than "spics or niggers." (Tr. 233).

I do not credit this testimony. First, Ms. Rosado–Ramos was plainly hostile to DOC, and on the witness stand she evaded questions, even when directed to answer. (Tr. 242–43, 245–46). Moreover, although she claimed to remember in detail her conversation with Deputy Warden Lasser, she purported to be unable to recall

whether she had been found guilty of conduct unbecoming an officer (Tr. 242–43) and whether she had been disciplined by Deputy Warden Lasser for failing to follow proper procedures. (Tr. 244). Her selective memory undermines her credibility.

Moreover, the testimony concerning Deputy Warden Lasser's alleged racist remarks was contradicted by three African-American DOC employees. Larry W. Davis is now a warden. (Tr. 349–50). While a captain, he had worked on-and-off for a total of approximately three years between 1991 and 1996 under the supervision of Deputy Warden Lasser. (Tr. 353). Yet, during this period he never heard Deputy Warden Lasser make racist remarks. (Tr. 353). Similarly, Leroy Grant, Jr., now a DOC bureau chief, worked under Deputy Warden Lasser at various times for a total of approximately six years between 1984 and 1998. (Tr. 414–18). He, too, never witnessed Deputy Warden Lasser make racially insensitive remarks. (Tr. 414–15, 418, 419–20). Finally, Correction Officer Mary Daniel worked as a secretary, first in close proximity to Deputy Warden Lasser in Bronx HDM between 1995 and 1997, and then as his personal secretary in 1998 and 1999. (Tr. 428–29, 432–33). At no time did Deputy Warden Lasser use racial epithets in Officer Daniels' presence. (Tr. 430–33).

Captain Fullard also suggests that discriminatory intent may be inferred from the fact that established selection policies were violated when the post was awarded to Captain Scherer. For example, the plaintiff argues that he had greater seniority than Captain Scherer and that this factor should have been dispositive. But it was established at trial that it is only seniority in the rank of captain that is relevant to post assignments, and Captains Fullard and Scherer were equal in that respect. (Tr. 369, 448–49). Moreover, even if that were not so, seniority was only one of several factors, none of which necessarily carried greater weight. (Tr. 441). Similarly, Captain Fullard is wrong to suggest that it was improper for Warden Eugui to consider recommendations of Deputy Warden Lasser. It was entirely consistent with DOC practice to take into account the evaluations of the candidates' superiors even if that was not a factor formally identified in the notice of the vacancy. (Tr. 441–42).

█ Based on the evidence in the record, it appears that Captain Fullard may well have been better qualified for the post of Programs Captain than was Captain Scherer. He had the same tenure as captain and more experience as a correction officer, and he had significant relevant training, as demonstrated by his graduate degrees. However, in the context of a Title VII case, the court may not second-guess the wisdom of a personnel decision, but should only determine whether the proffered explanation is a rational one. *See Tarshis v. Riese Organization,* 211 F.3d 30, 37 (2d Cir.2000). Here, Warden Eugui relied in large part on the recommendation of Deputy Warden Lasser, a sensible approach since the intermediate supervisors interact on a daily basis with the captains. Moreover, Captain Scherer had more experience in Bronx HDM than Captain Fullard. (Tr. 449). While the emphasis placed on this factor may have been excessive, it was hardly irrational. Thus, although the selection decision may not have been the most enlightened, it was not so irrational as to justify an inference of discriminatory intent.

In his reply brief, Captain Fullard argues that DOC "presented absolutely no non-discriminatory explanation" for its action. (Plaintiff's Post–Trial Reply Brief ("Pl.Reply") at 2–3). He reasons that Deputy Warden Eugui merely rubber-

stamped Deputy Warden Lasser's recommendation, and there has been no explanation for that recommendation since Deputy Warden Lasser did not testify. (Pl. Reply at 3). Thus, Captain Fullard argues that because he has established a prima facie case of discrimination and DOC has proffered no non-discriminatory explanation, he is entitled to judgment. (Pl. Reply at 3).

This analysis founders both on its factual premise and its legal conclusion. Although Warden Eugui relied heavily on Deputy Warden Lasser's recommendation, he did not do so to the exclusion of other considerations. He testified, "Basically I was relying not only on the line on the document [the recommendation], but the total package that's submitted, because this was ... part of a total package." (Tr. 486–87). Accordingly, DOC satisfied its burden by suggesting non-discriminatory grounds for the selection, including Captain Scherer's tenure at Bronx HDM. Although Captain Fullard characterizes DOC's rationales as weak, the defendant's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 509, 113 S.Ct. 2742). At that point, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappeared, and the sole remaining issues was discrimination *vel non*." *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (internal quotation marks and citations omitted). For the reasons discussed above, I do not find Captain Fullard's evidence of discrimination,

whether direct or indirect, to be sufficiently compelling.[6]

### B. *Hostile Environment*

■ Captain Fullard also advances an independent hostile environment claim. Title VII "is not limited to economic or tangible discrimination." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted). Rather, it is intended "to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatory hostile or abusive environment." *Id.* (internal quotation marks and citations omitted).

■ However, Title VII only bars discrimination with respect to "compensation, terms, conditions, or privilege of employment." 42 U.S.C. § 2000e–2(a)(1). Accordingly, for harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotations, citation, and brackets omitted). "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks and citations omitted). Factors to be considered in determining whether a work environment is hostile include "the frequency of the discriminatory

**6.** This finding is dispositive not only of Captain Fullard's disparate treatment claim under Title VII, but also of his Section 1981 and equal protection claims, since they each require a showing or purposeful discrimination.

*See Knight v. Nassau County Civil Service Commission,* 649 F.2d 157, 161–62 (2d Cir. 1981); *Gonzalez v. State of Connecticut,* 151 F.Supp.2d 174, 183 (D.Conn.2001).

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

■■■ One form of disparate treatment is a supervisor's use of racial slurs. But, "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* at 21, 114 S.Ct. 367 (internal quotation marks and citation omitted). Rather, "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986)). "[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs." *Schwapp*, 118 F.3d at 110–11 (internal quotation marks and citation omitted). Certainly, a "steady barrage of opprobrious racial comments" will create a hostile environment. *Id.* at 110 (internal quotation marks and citation omitted). Moreover, it is not necessary that the plaintiff have been the target of or even have witnessed the use of racial slurs. *See Cruz*, 202 F.3d at 571.

■■■ In this case, the evidence does not support Captain Fullard's hostile environment claim. Surely, if Deputy Warden Lasser had told the plaintiff that he would not receive a post assignment because he was African–American and had demeaned the aspirations of educated minorities, this would have been actionable as a sufficiently severe incident directly related to the conditions of employment. However, as discussed above, I do not credit Captain Fullard's description of the confrontation.

Nor do I find credible Ms. Ramos' testimony concerning another occasion on which Deputy Warden Lasser allegedly used derogatory racial and ethnic terms during a conversation with her.

Deputy Warden Lasser was disciplined in 1983 for making a remark to an employee that degraded her gender and ethnicity. (Tr. 495). However, because of its remoteness in time—more than a decade before the events at issue here—this incident is not highly probative of any hostile environment in 1995 or thereafter.

Captain Fullard also testified that Deputy Warden Lasser consistently used ethnically and racially derogatory terms. (Tr. 42–43). The plaintiff's testimony was rather conclusory, as he failed to specify when, where, or under what circumstances such language was used. (Tr. 43). Moreover, this evidence is inconsistent with the testimony of the three DOC employees who worked closely with Deputy Warden Lasser but never witnessed such conduct. Thus, although Deputy Warden Lasser may have sometimes used racially derogatory language, there is insufficient proof that he did so in a highly charged context or with the frequency necessary to create a hostile environment.

### C. *Retaliation*

■■■ Finally, Captain Fullard contends that when he complained of discrimination to an Assistant United States Attorney, DOC retaliated by transferring him to the Toxicology Unit. Title VII forbids an employer from "discriminat[ing] against any of its employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner is an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To prove retaliation, a

plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). There is no doubt that Captain Fullard's complaints to the Department of Justice constituted protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir.2002) (plaintiff need not prove that employer's conduct complained of was in fact illegal, but only that he had a "good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law"); *see also Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999) (same). And there is evidence that DOC became aware of those complaints. (Pl.Exh. 15). The dispute therefore centers around the third and fourth elements.

### 1. *Adverse Employment Action*

As discussed above, a transfer to a different captain's post at DOC may qualify as an adverse employment action. Here, the post in the Toxicology Unit to which Captain Fullard was assigned failed to utilize his skills or provide him with opportunities for professional growth. (Tr. 65–66). Moreover, overseeing the collection of urine hardly qualifies as a prestige assignment. (Tr. 65–66). By objective standards, then, Captain Fullard's transfer could be considered an adverse employment action.

Ironically, however, Captain Fullard stated to investigators that he was content in his assignment in the Toxicology Unit. (Tr. 166–67; Def. Exh. V). And, although he had the opportunity to request a transfer out of that unit, he never did. (Tr. 457). Accordingly, DOC argues that the assignment to Toxicology cannot be considered adverse.

There is substantial caselaw holding that the determination of whether an employment action is adverse is governed by an objective standard. *See Vasquez v. County of Los Angeles*, 307 F.3d 884, 891 (9th Cir.2002) (collecting cases); *Brown*, 2003 WL 1907974, at *4. These cases, however, generally hold that the plaintiff's subjective dissatisfaction with an employer's decision does not suffice to establish an adverse employment action. They do not address the mirror-image question presented here: Does an employee's subjective satisfaction with an employment action preclude him from later alleging that that action was adverse? That issue need not be decided in this case, however, because Captain Fullard has failed to prove causation.

### 2. *Causation*

■■■ The temporal proximity between when the Department of Justice notified DOC of its investigation on April 23, 1996 (Pl.Exh. 15) and when Captain Fullard was transferred to Toxicology on May 28, 1996, is evidence from which a causal connection could be inferred. *See Treglia*, 313 F.3d at 720; *Gorman–Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554–55 n. 5 (2d Cir.2001); *Cifra v. General Electric Co.*, 252 F.3d 205, 217 (2d Cir.2001). However, other factors militate against drawing an inference of retaliatory intent.

First, Captain Fullard's contact with the United States Attorney's Office was not the first time he had voiced his complaints. He had met with Deputy Warden Lasser and Warden Eugui and had filed a complaint with the EEO office at DOC. Thus, the incentive for DOC officials to retaliate against the plaintiff existed well before he contacted the Assistant United States At-

torney, and yet no action had been taken against him.

Second, DOC has proffered a plausible explanation for Captain Fullard's assignment to Toxicology. Prior to the transfer, the plaintiff had been posted to the Applicant Investigation Unit. (Tr. 58). As Captain Fullard acknowledges, he sought that assignment because he had recently given testimony concerning misconduct and he wanted to separate himself from potentially vengeful correction officers. (Tr. 58–59). DOC therefore viewed that posting as merely temporary. (Pl.Exh. 23).

Finally, and most important, the plaintiff has failed to link the decision to transfer him to Toxicology with any decisionmaker who might have had a retaliatory motive. Warden Eugui had himself been transferred out of the Bronx HDM on October 30, 1995, well before Captain Fullard's assignment to Toxicology in January 1996. (Tr. 154–55, 438). Similarly, Deputy Warden Lasser had also been transferred out of Bronx HDM when he received a promotion in October 1995. (Tr. 155). While it is, of course, possible that these officials still had some influence on the transfer of Captain Fullard, there is no evidence to support such speculation. Accordingly, in the absence of any other proof that the plaintiff was transferred to Toxicology because of his complaints about the assignment of posts, the timing of that transfer alone is not sufficient to establish Captain Fullard's retaliation claim.

*Conclusion*

Captain Fullard has not proven by a preponderance of the evidence that he was denied the post of Programs Captain because of his race, that he was subjected to a hostile work environment, or that he was retaliated against for voicing claims of discrimination. The Clerk of Court shall therefore enter judgment in favor of the defendant dismissing the complaint.

SO ORDERED.